Michael ROSALES, Petitioner,

v.

Janie COCKRELL[1], Director, Texas Department of Criminal Justice, Institutional Division, Respondent.

No. Civ.A. 5:00–CV–216–C.

United States District Court,
N.D. Texas,
Lubbock Division.

Sept. 25, 2001.

---

1. Effective August 1, 2001, Janie Cockrell was named as the Director of the Texas Department of Criminal Justice, Institutional Division, and the caption is being changed pursuant to Fed.R.Civ.P. 25(d).

598

Philip Alan Wischkaemper, Attorney at Law, Snuggs & Wischkaemper, Lubbock, TX, Gary A. Taylor, Attorney at Law, Law Office of Gary Taylor, Austin, TX, for Michael Rosales.

Tommy Skaggs, Attorney at Law, Attorney General of Texas, Habeas Corpus Division, Austin, TX, Philip A. Lionberger, Attorney at Law, Attorney General of Texas, Solicitor General Division, Austin, TX, for Gary Johnson, Director TDCJ–ID.

S. Michael Bozarth, Attorney at Law, Attorney General of Texas, Law Enforcement Defense Div., Austin, TX, for Janie Cockrell, Director TDCJ–ID.

### ORDER

CUMMINGS, District Judge.

Came on for hearing the above-styled and -numbered cause. Both parties appeared and announced ready. Having considered the testimony and arguments, as well as the pleadings, the state court records, and the relevant law, the Court enters the following Order, which constitutes the Court's findings of fact and conclusions of law.

## I. BACKGROUND

### A. Procedural Background

Petitioner Michael F. Rosales ("Rosales"), Texas Department of Criminal Justice, Institutional Division ("TDCJ–ID"), identification no. 999274, is incarcerated pursuant to a judgment and sentence from the 364th Judicial District Court of Lubbock County, Texas, in cause no. 97–425,078. Rosales was indicted for the offense of capital murder in that cause on July 2, 1997. *See* Tex. Penal Code § 19.03(a)(2) (stating that a person commits the offense of capital murder if he commits murder as defined in § 19.02(b)(1) and he intentionally commits murder in the course of committing or attempting to commit, *inter alia,* burglary or robbery). Rosales pleaded not guilty and his jury trial commenced on April 6, 1998. The jury subsequently found Rosales guilty of capital murder, answered the punishment special issues affirmatively, and on May 20, 1998, the state trial court sentenced Rosales to death. Tex.Code Crim.P. art. 37.071 § 2 (Vernon's Supp.2001). Rosales was represented at trial by court-appointed attorneys Jesse Mendez and David Hazlewood.

Attorney David Duncan was appointed to represent Rosales on appeal and he filed a direct appeal which raised six points of error. *See Clark v. Johnson,* 227 F.3d 273, 283 (5th Cir.2000) (finding that a defendant sentenced to death in Texas appeals directly to the Court of Criminal Appeals). The Court of Criminal Appeals, however, affirmed the conviction and sentence of death in a published opinion issued on October 13, 1999. *Rosales v. State,* 4 S.W.3d 228 (Tex.Crim.App.1999).

The United States Supreme Court denied Rosales's petition for writ of certiorari on November 27, 2000.

On September 16, 1999, Rosales filed an application for a writ of habeas corpus in the state trial court and raised the following eleven grounds for review:

(a) ineffective assistance of counsel because his trial counsel failed to investigate and present mitigating evidence during the punishment phase of trial;

(b) ineffective assistance of counsel because his trial counsel failed to investigate and present evidence during the guilt-innocence phase trial that "questioned his guilt of capital murder";

(c) ineffective assistance of counsel because trial counsel failed to investigate, obtain, and use evidence to impeach the State's witnesses and evidence during the guilt-innocence phase of trial;

(d) ineffective assistance of counsel because trial counsel failed to present live at trial two expert witnesses, originally retained by the State as consultants, who previously opined in written reports to the District Attorney that Rosales was not likely to be a continuing threat to society;

(e) ineffective assistance of counsel because the attorney handling his direct appeal failed to raise a point of error in the Court of Criminal Appeals challenging the sufficiency of the evidence on the jury's finding of future dangerousness;

(f) ineffective assistance of counsel because his attorney on direct appeal failed to raise a point of error in the Court of Criminal Appeals challenging the trial court's overruling of trial counsel's objection to testimony elicited by the prosecution on whether Rosales's expert on future dangerousness had interviewed Rosales;

(g) his Fifth Amendment right against self-incrimination when the trial court overruled his trial counsel's objection to testimony elicited by the prosecution on whether Rosales's expert on future dangerousness had interviewed Rosales;

(h) his Sixth Amendment right to confront the witness, Dr. Gary Mears, the State's expert on future dangerousness, because the trial court barred Rosales's trial counsel from impeaching Dr. Mears with excerpts from an incomplete and uncertified transcript from a previous trial in which Dr. Mears testified;

(i) ineffective assistance of counsel because his appellate attorney failed to argue that Rosales's constitutional rights under the Confrontation Clause were violated by the trial court's improper limitation on impeachment of Dr. Mears by means of the incomplete and uncertified trial transcript from a different proceeding;

(j) ineffective assistance of counsel because trial counsel failed to preserve the issue for appeal on whether the trial court erroneously prohibited trial counsel from impeaching Dr. Mears by means of the incomplete and uncertified trial transcript from a different proceeding; and

(k) his rights under the Due Process and Equal Protection clauses because of alleged errors in the Court's Charge on Punishment.

On February 28, 2000, the Honorable Bradley S. Underwood, the same judge who presided over Rosales's capital murder trial, determined that there were "no controverted, previously unresolved factual issues material to the legality of [Rosales's] confinement"; adopted the State's proposed findings of fact and conclusions of law; and recommended to the Court of Criminal Appeals that the application for habeas relief be denied.

On April 12, 2000, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions and denied Rosales's habeas application in an unpublished *per curiam* opinion.

Rosales filed the instant petition for writ of habeas corpus in this Court on November 29, 2000, and raised the same eleven grounds for review that he raised in his state habeas application. Respondent filed an answer to the petition, along with a motion for summary judgment and brief in support thereof, on January 30, 2001. Ro-

sales's state court records were filed with this Court on July 27, 2000.

This Court conducted a hearing on February 27, 2001, regarding Rosales's federal habeas claims. Petitioner Michael Rosales was present and represented by attorneys Gary Taylor and Philip Wischkaemper; Respondent was represented by an Assistant Attorney General for the State of Texas. The only witness called to testify was Jesse Mendez, one of Rosales's trial attorneys, and he was examined and cross-examined. Both parties presented arguments in support of their respective positions.

## B. The Offense

In the spring-summer of 1997, twenty-three-year-old Michael Rosales was staying with various friends and relatives in Lubbock, Texas. Rosales was originally from Lamar, Colorado, but had been to Lubbock a number of times, often staying with friends or relatives for several months at a time. Moreover, Rosales was on probation in Lubbock County for the felony offense of possession of a controlled substance in cause no. 95–420,425 in the 72nd Judicial District Court of Lubbock County, Texas. Although Rosales had previously violated the terms and conditions of his probation and was on intensive supervision on June 4, 1997, he had removed his electronic monitor and was avoiding his probation officer at that time.

Prior to June 4, 1997, Rosales had been convicted of the class A misdemeanor theft of property of the value of $200 or more but less than $750 in cause no. 91–483,570 in the County Court at Law # 1 of Lubbock County, Texas, and the class A misdemeanor burglary of a vehicle in cause no. 95–445,860 in the County Court at Law # 1 of Lubbock County, Texas.

Testimony at trial showed that sometime on Tuesday, June 3, 1997, Rosales went to the apartment of Angela Ammons ("Ammons") in the Four Seasons Apartments in Lubbock, Texas, and offered to share some beer with Ammons and Rosales's friend, Alfreda Latrice Bunton ("Bunton"). Rosales used the telephone several times while he was at the apartment and asked to borrow $10.00. When Bunton told Rosales that she did not have the $10.00, Rosales left the apartment. He returned several times during the night to make additional telephone calls.

At about 4:00 a.m., Rosales returned to Ammons's apartment and asked to use the telephone. Ammons let Rosales in the apartment, but Bunton was on the telephone with her boyfriend and would not let Rosales make a call. Rosales again left the apartment.

At about 5:00 a.m., Rosales knocked on Ammons's apartment door and repeated his request to use the telephone. Bunton went to the door, but suspecting that Rosales might be high on cocaine because of his agitated movements and red eyes, she refused to let him in the apartment. Rosales left and neither Ammons nor Bunton saw him again until later in the day on June 4, 1997.

Rudy Perez ("Perez"), who had known Rosales for approximately nine (9) years and occasionally allowed Rosales to stay in his apartment, lived in apartment no. 18 at the Four Seasons Apartments with his wife, children, and a niece. On June 4, 1997, Perez received a telephone call from Rosales at about 2:00 a.m. Rosales asked Perez if he could borrow $20.00, but Perez informed him that he did not have the money. Rosales then asked if Perez's wife, Yesenia Olivas ("Olivas"), would have the money. When Perez told him "No," Rosales asked if he could come to Perez's apartment and use the telephone. In less than five minutes, Rosales arrived at the apartment, used the telephone for about ten minutes, and left.

Perez's wife came home from work between 3:00 a.m. and 4:00 a.m. on June 4, 1997, and she heard the telephone ring soon after she arrived at their apartment. Perez answered it and after he hung up, he told Olivas that Rosales was going to spend the night with them. Olivas heard someone come in between 6:00 and 6:30 a.m., so she asked, "Michael, is that you?" When he answered, "Yes," she told him to lock the door behind him and help himself to the guest blankets.

Corinna Cantu ("Cantu"), Perez's twenty-four-year-old niece who was temporarily living with Perez's family, arrived at the apartment at about 8:00 a.m. on June 4, 1997. Finding the front door locked, she knocked on the door. Rosales opened the door and appeared to be getting ready to leave. After Perez, his wife, and Rosales left the apartment to go to work, Cantu went to sleep on the couch. She was awakened, however, at about 10:00 a.m. by knocking on the front door. When Cantu looked out the door, she saw Rosales and let him in the apartment. She then went back to sleep on the couch until 11:00 a.m., when Olivas arrived home from work.

When Olivas came home from work, she brought fried chicken with her from work for lunch. She invited Rosales to have lunch with her family, but before he ate lunch, Rosales asked if he could shower or clean up. Rosales then went into the bathroom. While waiting for Rosales to finish in the bathroom, Cantu could hear the water running. After Rosales finished in the bathroom, Cantu went in to wash and noticed wet drops of blood around the sink.

After Cantu finished washing, she, Olivas and her children, and Rosales sat down to eat lunch. As they were eating, Rosales asked Olivas if she knew how to remove blood from a white shirt. She replied that if he had not already washed it, he should soak it in cold water. Rosales then went into either the bedroom or the bathroom and came back carrying a white T-shirt. He showed the shirt to Cantu, who saw what appeared to be a bloody handprint on the left shoulder that was smudged down to the right across the back of the shirt. Without commenting on the shirt, Rosales went into the kitchen and placed the shirt in cold water to soak.

Sometime later that afternoon, Olivas rented a carpet shampooer and Rosales watched her children while she and Cantu cleaned the carpets in their apartment.

Sixty-eight-year-old Mary Felder ("Felder" or the "victim") lived in apartment no. 19 at the Four Seasons Apartments, next door to Rudy Perez and his family. On June 4, 1997, her twenty-one-year-old grandson Lafayette Robinson came to her apartment at about 10:00 a.m. He testified that he came to check on his grandmother because she had failed to come to his apartment to wake him, as was her custom. When Robinson knocked on her door at 10 a.m., there was no answer so he left to go visit a friend. Although Robinson had a key to his grandmother's apartment, he testified that he had lost it sometime prior to June 4, 1997.

Robinson stayed at his friend's apartment for about two hours and then returned to his grandmother's apartment. He knocked on the door once more but again received no answer. He returned to his friend's apartment, where he remained until about 4:00 p.m. that afternoon.

Robinson went to his grandmother's apartment for the third time on June 4, 1997, at about 4:00 p.m., and this time he noticed that a small window near the knob of his grandmother's front door was "broken out." Robinson reached in to unlock the door to the apartment but discovered that it was already unlocked. After entering the apartment, Robinson called out to his grandmother. When she did not answer, he looked through the apartment

and went into the kitchen to get a bowl of cereal. Before Robinson started eating his cereal, however, he went to his grandmother's bedroom door and called her name again. Although there was no answer, he testified that he felt compelled to go into her bedroom, where he discovered his grandmother slumped over against the wall in a sitting position and apparently not breathing.

Robinson panicked and ran downstairs to the apartment laundry room to call 911 from a pay phone. Robert Bunton (a relative of Alfreda Bunton) and Rosales were standing outside the laundry room talking when Robinson hurried past. Robinson said to them that his grandmother was either sick or had suffered a heart attack and then went on into the laundry room to call 911.

Robert Bunton and Rosales immediately ran upstairs to check on Mary Felder. Although Robert Bunton stopped at the apartment door and called out her name, Rosales went into the apartment. In a matter of seconds, Rosales came out of the bedroom, said "Oh gee," and went outside. Robert Bunton then went into the apartment, saw the victim slumped against the wall in her bedroom, and came back to the doorway where he stayed until the authorities arrived. Robert Bunton testified that neither he nor Rosales touched anything in Mary Felder's apartment when they went in to check on her.

Cantu and Olivas were cleaning the carpet in apartment no. 18 when they heard a commotion outside the apartment and heard someone yell to call 911. Cantu called 911, but she did not have any information to give the operator. Cantu observed Robinson run out of his grandmother's apartment and saw Rosales and Robert Bunton go into apartment no. 19. The two men remained in the apartment for no more than a minute or a minute and a half before she saw them run back out.

Rosales then ran past her into Perez's apartment and she heard him vomiting in the bathroom.

When Robinson called 911, he could not tell the operator whether his grandmother was breathing, but EMS arrived at the apartment within minutes of his call. Paramedic Kasey Johnson testified that she entered Felder's bedroom in apartment no. 19 and found the victim covered in blood. Because she was not breathing, some of the blood was dry, and there was an odor in the apartment which indicated that the victim had been dead for some time, Johnson did not perform any medical treatment but merely waited for the police to arrive. When the police arrived, the paramedics stated that they did not touch anything or observe anyone else touch anything in Felder's apartment.

Later in the evening on June 4, 1997, Cantu testified that she, Rosales, and Rudy Perez were sitting outside Perez's apartment and talking when she wondered "who would do something like that to a lady like Mrs. Mary." She heard Rosales reply that he "did it. I killed Ms. Mary." Cantu noted that Rosales's voice was unemotional and he looked serious. Disbelieving Rosales, however, she told him to "shut up." Rosales then told her that he really would not do anything like that.

## C. The Investigation

Two detectives from the Lubbock Police Department's Crimes Against Persons Division, Leland Hufstedler and Rey Martinez, were dispatched to the Four Seasons Apartments shortly after 4 p.m. on June 4, 1997. Detective Martinez testified that when he entered the courtyard of the apartment complex, Rosales approached him and told him that he knew the victim, that he had last seen her alive on Tuesday, and that he had taken the EMS personnel to her apartment. Martinez spoke with

him for about ten minutes and did not notice any blood on Rosales's clothing or shoes.

The police sealed off the victim's apartment as soon as they arrived and began taking photographs of the apartment and collecting evidence. There was testimony that Felder's bedroom was disorganized and there appeared to have been a struggle in the room. Her purse was found at the foot of her bed and had blood on it; no money was found in the apartment and the scene was consistent with a burglary or robbery. The police found Felder "in a seated position up against the wall in [a] chair." Blood was found on a curtain near her, on the floor, on the bed, underneath the bed, on the walls, and on the ceiling, and blood covered her body. Bloody shoe prints were found on the purse and a dayplanner.

The investigation continued for several hours and Detective Martinez spoke to Rosales several times during this period. At one point when he was searching some dumpsters on the west side of the apartment complex, Detective Martinez noticed Rosales sitting on the rear of a parked car watching him. Rosales asked the detective what he was doing and why, and then suggested that the police needed to be looking in the apartment complex and questioning the residents of the Four Seasons Apartment complex.

Detective Martinez further testified that he returned to the Four Seasons Apartments on the morning of June 5, 1997, to continue his investigation. He was approached in the apartment complex's courtyard by Rosales, who asked if the police had solved the crime. Detective Martinez replied that the investigation was still ongoing, and then he routinely invited Rosales to accompany him to the police station to give a formal witness statement. Rosales agreed, and they went together to the station.

While Rosales was giving his statement to Detective Martinez at the police station, Detective Hufstedler was summoned to the Four Seasons by another detective. This detective had spoken with Cantu, who had begun to "add things up" and now suspected that Rosales might be the killer. When Detective Hufstedler arrived, he spoke with Cantu, who told him about Rosales wanting to know how to get blood out of a shirt and about the blood on Perez's bathroom sink.

The detective asked for and obtained Perez's permission to search his apartment. In the bathroom closet of Perez's apartment, amongst a pile of dirty clothes, the detectives found a damp, white, blood-stained T-shirt and a pair of bloody blue jeans identified as belonging to Rosales. Subsequent DNA testing showed that the blood on the T-shirt and the jeans was consistent with Mary Felder's blood.

Criminalists from the Department of Public Safety were summoned to Perez's apartment to collect blood samples from around the sink in the bathroom and the front door of the apartment. Subsequent DNA analysis showed that the sample taken from the bathroom sink was consistent with both the victim's blood and Rosales's blood, but the sample taken from Perez's front door was consistent only with the victim's blood.

While Rosales was at the police station giving his witness statement, Detective Martinez received a call from Detective Hufstedler, who told him of the discovery of the bloody clothes. Although Detective Martinez testified that Rosales immediately became a suspect, he did not tell Rosales that he was a suspect; rather, he read Rosales the Miranda warnings at that time and allowed him to finish his witness statement. Detective Martinez further stated that Rosales was not free to leave the police station after giving his witness

statement because he had discovered that Rosales had an outstanding arrest warrant for a traffic violation.

Shortly thereafter, Detective Martinez received Polaroid pictures of the bloody clothing recovered from Perez's apartment. When confronted with the photographs, Rosales offered an explanation for the bloody clothing that was inconsistent with the physical evidence. Detective Martinez testified that when advised of the inconsistency, Rosales became quiet and eventually told the detective that he wanted to make another statement. Detective Martinez then recorded Rosales's second statement, which stated:

I am giving this statement and I only want to make one request, that I don't deserve to live, and I want the lethal injection or the gas chamber for me as soon as possible because I don't want to live after I tell Detective Martinez the truth about what happened. I want to say Tuesday night, I was smoking some rock cocaine, and I think I smoked about $50 worth. I had run out of money and cocaine. So sometime early Wednesday morning, I think it was about 3:00 o'clock or 4:00 o'clock a.m., I went to Ms. Mary's apartment to see if I could steal something from her, like a VCR, so I could trade it and score some more cocaine. When I got to her apartment, there was a mop by the door on the outside, and I used it to break a small window on the door so I could get in. I unlocked the door and went inside her apartment. I went into her bedroom and started looking around. Ms. Mary woke up and started to get up. I was kneeling down by the bed, but when she got up, she stepped on me. She recognized me. She called me by my name and told me that she was going to call the police. She grabbed me by the front of my shirt, and I grabbed her by the wrists. I then pulled her off the bed and grabbed her by the hair. I took her

into the kitchen and told her that I did not want to hurt her. She kept hitting me. I grabbed a steak knife off the kitchen table and dragged her back to her room. She kept talking about the police and started yelling. I told her to keep it down, but she kept yelling. I then started stabbing her. I think I stabbed her in the stomach first, and she fell where you found her. I then kept stabbing her. I told her that I was sorry and asked her to die, but she kept breathing. I started to leave at one point after I had stabbed her, but she was still alive, so I went back, and I started stabbing her on her neck or chest. I think I was in there with her for about 30 minutes. I then left her apartment, but I took the knife with me. I walked to the 6th Street gate from the complex and walked across the street to the alley and threw the knife away, I went to apartment number 18 and went inside and went to bed. I did not leave the apartment until in the morning. Before I went to bed, I went into the restroom and cleaned my arms off because I had a lot of blood on them. I also changed clothes and put the bloody clothes I had on with Yesenia's dirty clothes. The next day, I soaked the shirt to get the blood off.

I want to say that I did not go into Ms. Mary's apartment to kill her. I wanted to just steal something from her. I also just want to die as quick as she did.

Rosales signed the confession before a notary public.

After Rosales signed the second statement, he went with Detective Martinez and several other officers to the Four Seasons Apartment complex so that he could show them where he disposed of the murder weapons. Rosales initially directed the officers to a vacant lot, but when the officers could not locate the weapons and

confronted him with this fact, he directed them to a dumpster in the alley adjacent to the Four Seasons—the same dumpster that Rosales watched Detective Martinez search the day before. In the search of the dumpster, the police uncovered a white, plastic trash bag containing: (1) a bloody pair of needle nose pliers; (2) a bloody steak knife with a 4½ inch blade with its tip bent upwards; and (3) a bloody two-pronged kitchen fork with its tongs bent backwards. Subsequent DNA testing revealed that the blood on these instruments was consistent with the victim's blood.

The testimony regarding the autopsy of Mary Felder showed that altogether, she sustained a total of 113 wounds, including: 21 stab wounds; 28 incised or cut wounds; 33 blunt force injuries; and 31 puncture wounds. Of these, 5 wounds were lethal, and 2 wounds were inflicted after Felder died. The autopsy further revealed that she sustained a lethal "blunt force injury" at the base of her neck that crushed her larynx and produced trauma that closed off her airway, causing her to "traumatically suffocate." There were wounds surrounding her mouth and lips indicative of blunt force trauma inflicted by a hard object, and there were extensive amounts of abrasions, contusions, and discoloration on her neck and throat. Several of her teeth were "traumatically displaced" and she had aspirated one of her dislocated teeth into her vocal cords.

There was a lethal stab wound in her right cheek, close to her nose and below her right eye, that penetrated into the roof of her mouth, lacerated her tongue almost in two, entered into the cranial cavity, and lacerated her brainstem and a substantial artery in the area. Stab wounds in both her left and right eye sockets penetrated her cranial cavity and lacerated the front of her brain. There was another lethal stab wound in the back of her neck that penetrated deeply enough to lacerate the left side of her brainstem. Several other cut or incised wounds were also apparent on the back of her neck.

There were two areas of multiple puncture wounds: one in the victim's left upper chest and one in her abdomen. There were eleven "individual, rounded puncture wounds" in her left chest that were approximately $\frac{3}{32}$ of an inch in diameter. There were thirty-one puncture wounds in her abdomen that were $\frac{3}{32}$ of an inch in diameter. The forensic pathologist who performed the autopsy on Felder testified that she was alive when she received the puncture wounds to her chest and abdomen. He described wounds on her arms and hands, which he opined were indicative of defensive wounds, that is, wounds typically inflicted "in the process of the victim trying to defend against a lethal force." The pathologist finally testified that, of the 108 non-lethal wounds inflicted, the wound patterns suggested that the person inflicting the wounds did not inflict them to kill but, rather, to inflict pain. He concluded that, considering the nature, number, and type of wounds present, Mary Felder's death was "very painful."

## II. STANDARDS OF REVIEW

### A. Jurisdiction

Jurisdiction is vested in this Court by virtue of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. §§ 2241 and 2254. *See Williams v. Taylor*, 529 U.S. 362, 402, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (holding that a federal petition filed after April 24, 1996, by an inmate convicted of capital murder in state court is reviewed under the AEDPA).

### B. Review under the AEDPA

Under § 2254(d), as amended by the AEDPA, a state prisoner may not obtain

relief on any of his claims that were adjudicated on the merits in the state-court proceedings unless the adjudication of the claims—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

■ "In the context of federal habeas proceedings, adjudication 'on the merits' is a term of art that refers to whether a court's disposition of the case was substantive as opposed to procedural." *Neal v. Puckett*, 239 F.3d 683, 686 (5th Cir.2001). If faced "with a silent or ambiguous state habeas decision, the federal court should 'look through' to the last clear state decision on the matter" to determine whether the state court decision was procedural or substantive. *Jackson v. Johnson*, 194 F.3d 641, 651 (5th Cir.1999). "Adjudication on the merits" requires that a state court afford a state prisoner a full and fair hearing on the merits, but a "full and fair hearing" does not necessarily require live testimony, and a paper hearing may be sufficient, especially where the state trial court and the state habeas court are one and the same. *Clark v. Johnson*, 202 F.3d 760, 766 (5th Cir.2000).

■ When the Texas Court of Criminal Appeals explicitly adopts the trial court's findings of fact and conclusions of law and denies relief, the decision qualifies as an "adjudication on the merits" for purposes of § 2254(d). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir.2000). *See also Barrientes v. Johnson*, 221 F.3d 741, 780 (5th Cir.2000) (holding that a denial of relief by the Texas Court of Criminal Appeals is a denial of relief "on the merits").

■ In addition, findings of fact made by a state court after a "full and fair hearing" are presumed to be correct and need not be relitigated by a federal habeas court unless a petitioner rebuts the presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). *See Jackson v. Anderson*, 112 F.3d 823, 824 (5th Cir.1997) (holding that the burden of rebutting the presumption was made more onerous by the AEDPA amendments to § 2254). This presumption is especially strong where the state court judge presiding over the state habeas proceedings is the same judge who presided over the capital murder trial. *Barrientes v. Johnson*, 221 F.3d at 774 n. 26.

■ If the state court decision is found to be an "adjudication on the merits," Section 2254(d)(1) provides the standard of review for questions of law and mixed questions of law and fact. *Caldwell v. Johnson*, 226 F.3d 367, 372 (5th Cir.), *cert. denied*, 530 U.S. 1298, 121 S.Ct. 22, 147 L.Ed.2d 1045 (2000) (citing *Williams v. Taylor*, 529 U.S. at 412–13, 120 S.Ct. 1495). Under the "contrary to" clause of § 2254(d)(1), "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413, 120 S.Ct. 1495; *Hill v. Johnson*, 210 F.3d at 485. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The Fifth Circuit has determined that "[i]n the absence of clear guidance from the Supreme Court, we conclude that our focus on the 'unrea-

sonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett,* 239 F.3d at 696. "Distinguishing between an unreasonable and an incorrect application of federal law, [the Supreme Court] clarified that even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable." *Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001) (citing *Williams v. Taylor,* 529 U.S. at 410, 411, 120 S.Ct. 1495).

■ Section 2254(d)(2) provides the standard of review for questions of fact that have been "adjudicated on the merits" in the state courts. *See Dowthitt v. Johnson,* 230 F.3d 733, 741 (5th Cir.2000). If a federal court determines, however, that there was no "adjudication on the merits" in state court, the federal court should conduct a *de novo* review. *Miller v. Johnson,* 200 F.3d 274, 281 n. 4 (5th Cir.2000).

## C. Exhaustion and Procedural Default

■ A state prisoner seeking federal habeas relief must exhaust the remedies available in the state courts, or show the absence or ineffectiveness of such remedies before federal collateral relief can be granted. 28 U.S.C. § 2254(b)(1). "The exhaustion requirement is satisfied when the substance of the federal claim has been fairly presented to the highest state court." *Whitehead v. Johnson,* 157 F.3d 384, 387 (5th Cir.1998). The Texas Court of Criminal Appeals is the highest court reviewing criminal cases in the state of Texas; thus, a prisoner incarcerated in the State of Texas pursuant to a capital sentence satisfies the exhaustion requirement by filing either an appeal directly to the Texas Court of Criminal Appeals or a state application for a writ of habeas corpus. *See* Tex.Code Crim.P. art. 37.071 § 2(h) (Vernon's Supp.2001) ("The judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals."); art. 11.071 (establishing the procedures for an applicant seeking habeas relief from a judgment imposing the death penalty).

■ "A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default." *Nobles v. Johnson,* 127 F.3d 409, 420 (5th Cir.1997). This doctrine requires a federal habeas court to refuse review of all claims which are found to have been defaulted in state court pursuant to "an independent and adequate state procedural rule," unless the petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Bousley v. United States,* 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). The procedural default doctrine applies "whether the default in question occurred at trial, on appeal, or on state collateral attack." *Edwards v. Carpenter,* 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000).

■ "The doctrine presumes that a state procedural ground is adequate and independent—the rule must, for instance, be regularly followed—and, ordinarily, the burden is on the habeas petitioner to demonstrate otherwise." *Hughes v. Johnson,* 191 F.3d 607, 614 (5th Cir.1999). A state procedural ground is "independent" if the last reasoned state court opinion clearly and expressly indicates that its decision is independent of federal law, *Reed v. Scott,* 70 F.3d 844, 846 (5th Cir.1995), and "[t]he 'adequacy' of a state procedural rule de-

pends on whether it is 'strictly or regularly followed' by the state courts." *Muniz v. Johnson,* 132 F.3d 214, 220 (5th Cir.1998). In addition, a state court's reliance on procedural default to dismiss a claim is an "independent and adequate state ground which bars federal habeas review," even if the state court addresses the merits of the claim in the alternative. *Sawyers v. Collins,* 986 F.2d at 1499. *See Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding.").

"With regard to the issue of cause [to excuse a procedural default], the Supreme Court has stated that

the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.... [A] showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable, would constitute cause under this standard."

*Barrientes v. Johnson,* 221 F.3d at 763–64 (quoting *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (internal citations and quotations omitted)). To establish the "prejudice" requirement, a petitioner must first show "cause" and then demonstrate actual prejudice resulting from that cause. *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 11, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992).

■ The "fundamental miscarriage of justice" exception is reserved for cases of actual innocence, that is, " 'where the petitioner shows, as a factual matter, that he did not commit the crime of conviction.' " *Fairman v. Anderson,* 188 F.3d 635, 644 (5th Cir.1999) (quoting *Ward v. Cain,* 53 F.3d 106, 108 (5th Cir.1995)). "To estab-

lish the requisite probability that he was actually innocent, the petitioner must support his allegations with new, reliable evidence that was not presented at trial and must show that it was 'more likely than not that no reasonable juror would have convicted him in the light of the new evidence.' " *Id.* (quoting *Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)). *See Bousley v. United States,* 523 U.S. at 623, 118 S.Ct. 1604 (" '[A]ctual innocence' means factual innocence, not mere legal insufficiency.").

### D. The *Teague* Retroactivity Doctrine

■ "The retroactivity principle established by the Supreme Court in *Teague [v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989),] 'prevents a federal court from granting habeas relief to a state prisoner based on a rule announced after his conviction and sentence became final.' " *Jackson v. Johnson,* 217 F.3d 360, 361 (5th Cir.2000) (quoting *Caspari v. Bohlen,* 510 U.S. 383, 389, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994)). "To apply *Teague,* a federal court engages in a three-step process": (1) "it determines the date upon which the defendant's conviction became final"; (2) it "survey[s] the legal landscape as it then existed and determine[s] whether a state court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution"; and (3) "if the court determines that the habeas seeks the benefit of a new rule, the court must consider whether the relief sought falls within one of the two narrow exceptions to nonretroactivity." *Lambrix v. Singletary,* 520 U.S. 518, 527, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997) (internal citations and quotations omitted). The *Teague* rule has two exceptions: (1) "if the rule 'places certain kinds of primary, private individual conduct beyond

the power of the criminal law-making authority to proscribe'"; or (2) "if it is a rule of procedure that is 'implicit in the concept of ordered liberty.'" *Barrientes v. Johnson*, 221 F.3d at 763 (quoting *Teague v. Lane*, 489 U.S. at 307, 109 S.Ct. 1060).[2]

■ Federal courts should ordinarily consider the procedural default issue before addressing the *Teague* retroactivity issue. *Lambrix v. Singletary*, 520 U.S. at 524, 117 S.Ct. 1517.

### E. Ineffective Assistance of Counsel

To establish ineffective assistance of counsel at trial or on direct appeal where the appeal is a matter of right under state law, a federal petitioner must demonstrate that (1) his counsel's performance was objectively deficient and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Evitts v. Lucey*, 469 U.S. 387, 395, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).

To demonstrate "deficient performance," a petitioner must show that his attorney's performance was "professionally unreasonable in light of all the circumstances" at the time of the performance. *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir.1999). The Supreme Court has determined that "[j]udicial scrutiny of counsel's performance must be highly deferential" because

> [i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. 2052 (internal quotations and citations omitted). *See Neal v. Puckett*, 239 F.3d at 687 (holding that in considering whether an attorney's performance was objectively reasonable, a court "must determine whether there is a gap between what counsel actually did and what a reasonable attorney would have done under the circumstances"). Thus, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690–91.

■ To demonstrate "prejudice," a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Clark v. Johnson*, 227 F.3d at 283 (quoting *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. 2052). "The 'prejudice' component focuses on the question whether counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair."

---

**2.** The Fifth Circuit Court of Appeals has recognized a third narrow exception to the *Teague* doctrine. *Jackson v. Johnson*, 217 F.3d 360, 364 (5th Cir.2000). This exception provides that "[w]hen an alleged constitutional right is susceptible of vindication only on habeas review, application of *Teague* to bar full consideration of the claim would effectively foreclose any opportunity for that right ever to be recognized;" therefore, *Teague* should not be applied to bar consideration of the claim. *Id.*

*Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (quotation omitted). Simply alleging prejudice will not suffice; the petitioner must affirmatively prove prejudice. *DeVille v. Whitley,* 21 F.3d 654, 659 (5th Cir.1994).

"Failure to make the required showing of *either* deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland v. Washington,* 466 U.S. at 700, 104 S.Ct. 2052 (emphasis added).

■■■ "[C]onclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding." *Miller v. Johnson,* 200 F.3d at 282.

A state court's findings of fact made in the course of deciding a claim of ineffective assistance of counsel are entitled to a presumption of correctness, but the "ultimate conclusion that counsel did not render ineffective assistance ... is a legal question which must be reviewed *de novo.*" *Amos v. Scott,* 61 F.3d 333, 348 (5th Cir.1995); *Wheat v. Johnson,* 238 F.3d 357, 362 (5th Cir.2001).

### III. GROUNDS FOR REVIEW

**A. Trial counsel was ineffective because he failed to investigate and present mitigating evidence which called for a sentence less than death.**

Rosales argues that although several of his brothers and sisters could have presented evidence of his abusive and poor childhood and several neighbors could have testified that he was not violent, trial counsel failed to investigate this evidence or present it at trial.

■■■ Although Rosales argues that this ineffectiveness claim was not adjudicated on the merits because he was not accorded a live evidentiary hearing in the state habeas proceedings, the Court finds the argument untenable. *See Sawyers v. Collins,* 986 F.2d 1493, 1504 n. 19 (5th Cir. 1993) (quoting *May v. Collins,* 955 F.2d 299, 313 (5th Cir.1992)) ("This Court has 'dealt on several occasions with factfinding by affidavit at the state trial court level, and each time we have found the procedures adequate for the purpose of § 2254(d)—even where the factual conclusions depended on credibility determinations.' "); *Drew v. Collins,* 964 F.2d at 423 n. 12 ("A state court need not conduct a live evidentiary hearing to be entitled to [the presumption of correctness]; it can evaluate an ineffective assistance of counsel claim based on the affidavits of the petitioner and the attorney."). The state habeas court determined that

> in Exhibit X[,] attached to the Application for Writ of Habeas Corpus, trial counsel stated that he hired a mitigation specialist, spoke with the family, and made a decision not to call the family as witnesses during the punishment phase. Trial counsel decided that he had elicited the most favorable information from one of the Applicant's sisters during cross-examination during the punishment phase and that the other family members' testimony would have done more harm than good. Further, defense counsel's trial strategy was to rely upon expert testimony to demonstrate that the Applicant was not a future danger. .... [T]he Applicant has failed to show that trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. Additionally, the Applicant has failed to establish prejudice....

■■■ Because this was clearly an adjudication on the merits, the findings of fact that trial counsel hired a mitigation specialist, spoke with the family, and made a tactical decision not to call family members are entitled to the presumption of correctness. *See Hill v. Johnson,* 210 F.3d at 489 (holding that the "absence of an evidentia-

ry hearing at the state level does not lead to the conclusion that the state court's findings should not be presumed correct"). Rosales has failed to present any evidence to rebut these findings. The finding that trial counsel was not ineffective is a legal conclusion which this court must review *de novo.*

▬▬▬ "[I]n the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett,* 239 F.3d at 688 (quoting *Baldwin v. Maggio,* 704 F.2d 1325, 1332–33 (5th Cir.1983)). The "failure to develop or present mitigating background evidence is not per se deficient performance." *Moore v. Johnson,* 194 F.3d 586, 615 (5th Cir. 1999). To determine prejudice on a failure to investigate or present mitigating evidence claim, the court is "required to compare the evidence actually presented at sentencing with all the mitigating evidence contained in the postconviction record" and determine whether the "additional mitigating evidence is so compelling that there is a reasonable probability that the jury could have determined that death was not an appropriate sentence." *Neal v. Puckett,* 239 F.3d at 691–92.

▬▬ Rosales's trial counsel presented the following evidence during the punishment phase of his capital murder trial:

(1) James Reynolds, custodian of records at the Lubbock County Jail, testified that Rosales's demeanor and behavior did not indicate a need for placement in the highest security level at the jail even though a charge of capital murder would indicate such a need.

(2) Detective Rey Martinez testified that Rosales wrote a note to Mary Felder's family on June 5, 1997, and apologized for his actions. The note was admitted into evidence and Detective Martinez further testified that he had delivered a copy of it to the victim's family.

(3) Professor Jonathan Sorensen, a criminologist with a Ph.D. in criminal justice, testified that based on Rosales's age, prior convictions, and prior behavior while institutionalized, the probability that he would commit another homicide was "at or below 1 per cent," the probability that he would commit a future act of violence was 10 per cent, and in his opinion, Rosales was not likely to be a danger in the future.

(4) Dr. Walter Quijano, a Ph.D. in clinical psychology, testified that Rosales was not likely to be a danger while he was incarcerated.

Although defense counsel did not call a member of Rosales's family, he did cross examine one of Rosales's sisters when she testified as a witness for the State. Mary Rosales testified that she was the older sister of Michael in a family of ten siblings; Michael had grown up in a very poor family who often did not have enough to eat; his father died about four years before his murder trial and Michael started drinking alcohol at that time; he dropped out of school in the 8th grade; only one of his brothers had graduated from high school; all but one of Rosales's brothers had been "locked up" at different times; and Mary did not want to see her baby brother "die." The State also called Rosales's mother to testify, but the record indicates that she was released before answering any questions because she was so emotionally distraught.

Rosales now contends, by way of affidavits from family members,[3] that his family

---

**3.** Habeas counsel provided affidavits from Michael's brothers, Rick, Joseph, and Jessie, and from his sister Carmen.

members would have testified that the Rosales family was very poor and moved often; their father was an alcoholic who beat his wife and children and often spent his paychecks on alcohol rather than food for his family; Michael often received the worst of the beatings and had even lost consciousness as a result of the beatings; although athletically talented, Michael was in special education classes and could not perform well enough academically to be allowed to participate in school athletics; Michael was depressed after the death of his father; he was good with his nieces and nephews and would often babysit for them; Michael and his brothers fought often while growing up; he considered himself a "screw up" and the "black sheep" of the family; and Michael told his brother that he wanted to return to jail. Although Rosales's family members acknowledge that they met with trial counsel and spoke with him on the telephone prior to the trial, they contend that counsel would not let them testify. Rosales also argues, by way of affidavit, that at least four other witnesses could have testified that Rosales was not violent, his reputation in the community was for being a "nice kid," and he had never caused problems in an apartment complex full of trouble makers. He argues that this evidence was available, could have been presented at sentencing to bolster the testimony of his expert witnesses, and would have persuaded the jury to assess a life sentence rather than the death penalty.

The Court has compared the evidence presented by defense counsel at the punishment phase with the additional mitigating evidence proposed by Rosales and finds that the additional evidence is both cumulative and not of such character or quantity that it raises "a reasonable probability that the result of the sentencing proceeding would have been different" if counsel had presented it at trial. *Williams v. Taylor*, 529 U.S. at 399, 120

S.Ct. 1495. *See Tucker v. Johnson*, 242 F.3d 617, 623 (5th Cir.2001) (holding that a court considering a claim for ineffective assistance for failure to present mitigating evidence must consider the "quality and volume of the additional mitigating evidence").

Accordingly, the Court finds that the state court's determination that Rosales failed to show prejudice from his counsel's decision to exclude evidence from the penalty phase was neither "contrary to" nor involved an "unreasonable application of" clearly established Federal law as determined by the Supreme Court. *See Neal v. Puckett*, 239 F.3d at 697 (holding that "the state court's prejudice determination was objectively reasonable in the sense that it was not inconsistent with the facts of [the] case—specifically, when those facts are viewed in the context of the extreme cruelty of the murder as an aggravating circumstance and that much of the mitigating evidence had already been presented to the jury, albeit in an abbreviated form").

Moreover, the Court also finds the state court's determination that trial counsel's performance did not fall below an objective standard of reasonableness is neither "contrary to" nor involved an "unreasonable application of" clearly established Federal law. The " 'failure to present mitigating evidence "if based on an informed and reasoned practical judgment, is well within the range of practical choices not to be second-guessed' " under *Strickland*." *Drew v. Collins*, 964 F.2d 411, 422 (5th Cir.1992) (quoting *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir.1992) (quoting *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir.1985))). *See Livingston v. Johnson*, 107 F.3d 297, 308 (5th Cir.1997) (holding that an informed decision by counsel not to present family members and friends simply because counsel does not believe they

would make a good impression on the jury can be a plausible trial strategy).

The Court notes, however, that even if the state court incorrectly determined that trial counsel's performance was reasonable, the failure "to show the existence of evidence of sufficient quality and force to raise a reasonable probability that, had it been presented to the jury, a life sentence would have resulted," renders this claim for ineffective assistance meritless. *Clark v. Johnson*, 227 F.3d at 284 (quoting *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir.1992)).

Accordingly, the Court finds that the state court decision was neither contrary to nor an unreasonable application of clearly established Federal law as determined by the Supreme Court.

## B. Trial counsel was constitutionally ineffective when he failed to investigate and present evidence which questioned his guilt of capital murder.

Rosales argues that "there was extensive evidence which questioned the truthfulness of his written statement—as well as his guilt of this offense," and trial counsel ineffectively failed to investigate this evidence, focusing their defense on the punishment phase of trial rather than on the guilt/innocence phase. Specifically, Rosales claims that there is potential testimony insinuating that the victim's grandson, Lafayette Robinson, may have murdered her, and that several people claim to have seen the victim alive between 7 and 8 a.m. on June 4, thus contradicting Rosales's written confession to the police.

■ A petitioner who alleges that his trial counsel was constitutionally ineffective because he failed to adequately investigate must "allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Lockett v. Anderson*, 230 F.3d

695, 713 (5th Cir.2000) (quoting *United States v. Green*, 882 F.2d 999, 1003 (5th Cir.1989)). "[T]o show prejudice in regard to a claim that the attorney failed to raise a certain defense, the petitioner must show that the defense likely would have been successful at trial." *Mangum v. Hargett*, 67 F.3d 80, 84 (5th Cir.1995).

■ The state habeas court considered this claim and determined that Rosales could not establish prejudice because of the overwhelming evidence presented at the guilt/innocence phase. Specifically, the state habeas court determined that

[e]vidence at the guilt/innocence phase was overwhelming that the Applicant committed the offense. Trial counsel filed a motion to suppress the Applicant's confession and vigorously contested the admission of the confession at a hearing. Trial counsel cross-examined the State's witnesses during the guilt innocence phase. Trial counsel stated that he conversed with the Applicant and reviewed the police reports and discovery from the prosecutor's office. He spoke with several of the police officers involved and viewed the physical evidence several times. Trial counsel determined that the Applicant's resources were best spent on investigating and presenting a punishment case. It is not ineffectiveness *per se* for counsel to concentrate his efforts at the punishment phase in a capital murder case. *Ex parte Davis*, 866 S.W.2d 234, 237 (Tex. Crim.App.1993). In this case, it was not deficient performance to concentrate defense efforts on the punishment phase. In addition, given the overwhelming evidence against the Applicant, the Applicant has failed to establish prejudice by the alleged deficient performance[,] as the Applicant's allegations do not undermine the reliability of the guilty verdict.

\* \* \* \* \* \*

... The Applicant contends that there was possible evidence that two other people, Lafayette Robinson or Rudy Perez, may have committed the offense. The Applicant claims that his attorney was deficient for failing to investigate the potential evidence and put it forth at trial. However, the evidence is based on mere conjecture and does not undermine the reliability of the verdict given the [Applicant's] confession to the police and two independent witnesses, the victim's blood found on the [Applicant's] clothing and the sink where the [Applicant] was seen washing off the blood, and the [Applicant] taking the police to the secreted murder weapons.

Hence, the state court addressed the merits of this ineffectiveness claim and the findings of fact are presumed to be correct under § 2254(e)(1). Rosales has offered no evidence to rebut these findings.

The record clearly supports the state court findings that trial counsel vigorously contested the admission of Rosales's confession, reviewed the police reports, interviewed several police officers, examined the physical evidence, cross-examined the State's witnesses during the guilt/innocence phase, and determined that his resources were best spent investigating and presenting a case at the punishment phase. In addition to these findings, the state court record shows that Rosales was given a polygraph examination,[4] and the officer administering the exam advised that Rosales "was telling the truth" about acting alone. The record further shows that Lafayette Robinson was given a polygraph examination regarding his sworn statement detailing his actions on the day of the murder, and the officer administering the exam concluded that Robinson "answered all the questions honestly." Hence, the

Court finds that trial counsel's decision not to argue that Robinson or someone else "may have committed the offense" but to focus his attention on the punishment phase was a strategic decision made after an objectively reasonable investigation of the facts and evidence. *See Williams v. Collins,* 16 F.3d 626, 632 (5th Cir.1994) (stating that the Fifth Circuit upholds "decisions of counsel not to put on evidence in mitigation of culpability when the decisions result from a strategic choice"). *See also Jones v. Jones,* 163 F.3d 285, 299 (5th Cir.1998) ("If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade."). The state court finding that trial counsel's performance was not objectively deficient was therefore a reasonable application of clearly established Federal law.

Nevertheless, even if trial counsel had pointed out the inconsistencies in Robinson's statements and presented the proposed witnesses who believe that they saw the victim, Rosales cannot demonstrate that such evidence was sufficient to create a "reasonable probability that the outcome of the trial would have been different," given his confessions of guilt, his knowledge of the location of the murder weapons, the forensic evidence, and the circumstantial evidence. *Id.* at 304. Thus, he cannot demonstrate that he was prejudiced by trial counsel's failure to investigate or present evidence at the guilt/innocence phase, and the state court finding of no prejudice was neither contrary to nor an unreasonable application of clearly established Federal law.

Accordingly, the Court finds that the state court's adjudication of this claim was neither contrary to nor involved an unreasonable application of clearly established

---

4. The results of Rosales's polygraph and Robinson's polygraph were reported to the Lubbock Police Department and officers from that department wrote reports which were provided to trial counsel.

Federal law as determined by the Supreme Court.

### C. Trial counsel was constitutionally ineffective when he failed to investigate, obtain, and use evidence available to impeach the state's witnesses and/or evidence.

 Rosales next argues that trial counsel was ineffective because he failed to impeach witness Rudy Perez with evidence that he was a violent man and a known drug abuser, and he failed to impeach witness Corinna Cantu with evidence that she was dating Rosales. The state court addressed these allegations and determined that Rosales's "evidence [was] based on mere conjecture and [did] not undermine the reliability of the verdict given [his] confession to the police and two independent witnesses, the victim's blood found on [his] clothing and the sink where [he] was seen washing off blood, and [Rosales] taking the police to the secreted murder weapons." Albeit concise, the state court's decision was an adjudication on the merits.

When the State called Rudy Perez to testify at trial, the prosecutor questioned Perez regarding his prior arrests and convictions. Perez testified that he had previously been arrested and that he had been convicted of "unlawfully carrying a concealed weapon," for which he served one year of probation. He further stated that he had not been convicted of any other misdemeanors or felonies. Although Rosales argues that trial counsel should have brought out through cross-examination that Perez was a known drug abuser and a violent person, he has failed to show that such evidence was admissible impeachment evidence; thus he has failed to demonstrate that trial counsel performed deficiently. Furthermore, Rosales failed to show that even if trial counsel had im-

peached Perez with such evidence, the outcome of the trial would have been different. See Crane v. Johnson, 178 F.3d 309, 312 (5th Cir.1999) (holding that the "mere possibility of a different outcome" is not sufficient proof of prejudice to support a finding of ineffective assistance of counsel). The Court finds that, in light of the overwhelming evidence of Rosales's guilt that was admitted through witnesses other than Rudy Perez, Rosales has failed to show that trial counsel's failure to impeach Perez rendered "the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. at 372, 113 S.Ct. 838.

 As for the complaint about trial counsel's failure to impeach Corinna Cantu with evidence that she had dated Rosales, the Court finds that Rosales has offered no evidence to demonstrate that this decision by counsel prejudiced his defense or rendered his trial unreliable. Cf. Koch v. Puckett, 907 F.2d 524, 530 (5th Cir.1990) ("[M]ere conclusory allegations on a critical issue are insufficient to raise a constitutional issue.").

Accordingly, the Court finds that Rosales has not demonstrated that the state court's adjudication of this claim was contrary to or involved an unreasonable application of clearly established Federal law.

### D. Trial counsel was constitutionally ineffective when he failed to produce for the jury the opinions of two expert witnesses who had opined that Rosales was not a future danger.

 Prior to trial, the State sought the opinions of two psychologists, Dr. Thomas G. Allen and Dr. Turpiville, concerning whether Rosales would probably commit future crimes of violence so as to be a danger to society in the future.[5] Both

---

**5.** Before a defendant convicted of capital murder can be sentenced to death in Texas,

the jury must find, inter alia, that "there is a

psychologists reviewed information provided by the State but neither interviewed Rosales. Both psychologists opined that Rosales most likely would not be dangerous in the future. The State provided copies of their opinions to defense counsel but decided not to call either psychologist as a witness for the State. Rosales argues that because his trial attorneys neither contacted the psychologists nor called them as witnesses, their performance was objectively deficient because they failed to present evidence which called for a sentence less than death.

The state habeas court addressed this ground and specifically found that:

(1) The investigator for the defense attempted to contact the two expert witnesses, but one expert refused to speak to the investigator and the other expert was out of the country when the investigator tried to contact him;

(2) Defense counsel was "suspicious" of the two experts because they had initially been hired by the state;

(3) Defense counsel was secure in the testimony of his two expert witnesses and decided to rely on their testimony; and

(4) Despite defense counsel's failure to present evidence of the two expert witnesses, the jury was made aware of Dr. Allen's opinion and the fact that he was initially hired by the state. The state court concluded that trial counsel had made a reasonable tactical decision not to call the two psychologists. This allegation of ineffectiveness was therefore adjudicated on the merits and the findings of fact are presumed to be correct under

§ 2254(e)(1). Rosales has failed to offer any evidence to rebut this presumption.

"In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Lockett v. Anderson,* 230 F.3d at 711 (quoting *Strickland v. Washington,* 466 U.S. at 691, 104 S.Ct. 2052). The findings by the state court refute Rosales's argument that his counsel completely failed to investigate the testimony of the two psychologists; in fact, his investigator did attempt to contact both psychologists, but one refused to speak with the defense and the other was "out of the country." Moreover, Rosales has failed to demonstrate that his trial counsel's decision not to call the two psychologists as witnesses was an "uninformed" strategic decision.[6] *See Lockett v. Anderson,* 230 F.3d at 715–16 (holding that an assertion of a "strategic decision" by trial counsel must be rejected where such decision follows a failure to conduct even a minimal investigation). The record shows that trial counsel read the psychologists' opinions as provided by the State; he attempted to contact the witnesses; and he was secure in the testimony of his two expert witnesses. Trial counsel has stated that he was "suspicious" of the two experts because they had been retained by the State; he did not know what information was provided for them to review before giving their opinions; and the State was overly generous in offering to make the witnesses available for trial, which made him apprehensive about being sand-

probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. . . ." Tex.Code Crim.P. art. 37.071 § 2(b) (Vernon Supp. 2001).

**6.** At trial, when the State inquired whether defense counsel wanted the State to bring in

the two experts to testify for the defense, defense counsel responded, "[O]n the record, Judge, we've had conversations among ourselves and our client, and our position right now is that we do not want to call either one of them." This indicates that the decision had been discussed with Rosales.

bagged. Although this Court, viewing the decision in hindsight, might disagree with trial counsel's decision to forego speaking directly with the two psychologists, the decision was not so inept as to have been professionally unreasonable. *Williams v. Collins*, 16 F.3d 626, 632 (5th Cir.1994). Thus, the Court finds that the state court's conclusion that counsel made a "strategic decision" was not contrary to or an unreasonable application of clearly established Federal law.

Furthermore, Rosales has failed to demonstrate that he was prejudiced by trial counsel's failure to investigate or call the two psychologists. At trial, the State's expert, Dr. Mears, testified that he was the supervisor of Dr. Allen and was aware that Dr. Allen had been contacted to review the evidence in this case. When asked if he knew that Dr. Allen had opined that Rosales would probably not commit acts of violence in the future, Dr. Mears replied that he did not think so, but if Dr. Allen had expressed that opinion, such opinion indicated to him that Dr. Allen did "not understand the DSM–IV." When Dr. Quijano testified for the defense, he stated that he had reviewed the reports of the State's experts; "the State experts describe [Rosales] as will become [*sic*] a model prisoner"; and "Dr. Allen which—who is the State's expert described his violence as reactive. In other words, [Rosales] went to commit one offense, and then, found himself in a situation, committed a second offense." Thus, an abbreviated edition of Dr. Allen's opinion actually was presented to the jury. In light of this evidence and the fact that trial counsel presented evidence on future dangerousness from his two experts, the Court finds that Rosales has not demonstrated that but for his failure to present the testimony of the State's two psychologists, he would have received a life sentence.

Hence, the Court finds that the state court's adjudication was neither contrary to nor an unreasonable application of clearly established Federal law.

**E. Appellate counsel was constitutionally ineffective when he failed to argue that Rosales was entitled to a life sentence because the state had failed to prove that he would probably commit crimes of violence in the future so as to constitute a danger to society.**

At the punishment phase of Rosales's trial, the State was required to prove beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex.Code Crim.P. art. 37.071 § 2(b)(1). Rosales argues that if his counsel had argued on appeal that the evidence was insufficient to support the jury's affirmative finding on this issue, the Court of Criminal Appeals would have had to reverse his death penalty and remand for imposition of a life sentence.

■ Appellate counsel is not required to raise every nonfrivolous issue on appeal, "but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). Indeed, it is counsel's professional duty to choose among potential issues, according to his judgment as to their merit and his tactical approach. *Jones v. Barnes*, 463 U.S. 745, 752, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). When a petitioner alleges that counsel was ineffective for failing to brief an issue on direct appeal, he must "show initially that the appeal would have had, with reasonable probability, a different outcome if the attorney [had] adequately addressed the issue." *United States v. Dovalina*, 262 F.3d 472, 474 (5th

Cir.2001). This requires a court to "counterfactually determine the probable outcome on appeal had counsel raised the argument." *United States v. Williamson,* 183 F.3d 458, 463 (5th Cir.1999). In this claim, therefore, the Court must first determine whether the evidence was legally sufficient to support the jury's affirmative finding.

To determine whether the evidence is sufficient to support an affirmative finding on one of the special issues at the punishment phase of a capital murder trial in Texas, a court must decide "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements ... beyond a reasonable doubt." *Hughes v. Johnson,* 191 F.3d at 619 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). *See Martinez v. Johnson,* 255 F.3d 229, 244 (5th Cir.2001) (stating that the Fifth Circuit Court of Appeals has employed the *Jackson* standard to assess the adequacy of the evidence for a capital sentence in Texas sentencing decisions).

■■■ The state habeas court addressed this claim and specifically found that the State of Texas presented the following evidence during the punishment phase:

(1) The victim suffered 113 wounds;

(2) Rosales had previously been convicted of misdemeanor theft, misdemeanor burglary of a vehicle, and a state jail felony of possession of a controlled substance;

(3) Rosales had previously pushed a child to the ground, failed to identify himself to a police officer, violated the conditions of his probation, possessed marijuana and cocaine, evaded detention, and possessed a large, homemade knife; and

(4) Dr. Mears, a clinical psychologist and neuropsychologist, opined that Rosales was a sociopath who would probably commit future crimes of violence. The state

court concluded that (a) the evidence at punishment "viewed in the light most favorable to the verdict" was legally sufficient to support the jury's finding that Rosales would probably commit crimes of violence in the future; (b) the failure to raise the issue on appeal was not objectively deficient performance; and (c) Rosales did not establish prejudice from appellate counsel's failure to raise the issue on appeal. This decision by the state court was an "adjudication on the merits," and the findings of fact are supported by the record and presumed to be correct under § 2254(e)(1). Rosales has offered no evidence to rebut the findings.

Although the state habeas court failed to cite *Jackson v. Virginia, supra,* in their findings and conclusions, that court used the *Jackson* standard to review the sufficiency of the evidence offered to prove Rosales's future dangerousness. In light of the state court's findings regarding the heinous nature of the offense (113 wounds), Rosales's prior criminal history, and the expert opinion that Rosales was a sociopath who would be dangerous in the future, the state court decision that the evidence was legally sufficient was not an unreasonable application of federal law as determined by the Supreme Court.

Because Rosales cannot demonstrate that the evidence was insufficient to support the affirmative finding on future dangerousness, he cannot demonstrate that his appellate counsel's failure to raise the issue was objectively unreasonable or that he was prejudiced by the failure to raise the issue on appeal. *See United States v. Dovalina, supra* (holding that appellate counsel was not ineffective for failing to adequately brief the issue of sufficiency of the evidence on direct appeal where the record showed the evidence was in fact legally sufficient because he could not show prejudice). *See also Penson v. Ohio,*

488 U.S. 75, 83–84, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988) (holding that courts have refused to find appellate counsel ineffective for failing to advance meritless issues on appeal).

Accordingly, the Court finds that the state court's decision was not contrary to or an unreasonable application of clearly established Federal law.

**F. Appellate counsel was constitutionally ineffective because he failed to argue that Rosales was entitled to relief when the State commented on Rosales's silence.**

 In this ground, Rosales argues that appellate counsel should have raised a claim regarding the State's violation of his Fifth Amendment right not to testify during the cross examination of defense witness Dr. Quijano. The following exchange occurred between Dr. Quijano and the prosecutor:

| | |
|---|---|
| The State: | ... Did you have a chance to interview the defendant before you made your opinion? |
| Dr. Quijano: | No. |
| The State: | Having done this many different times, you know that there's kind of a split of ideas on whether you should interview a defendant, right? |
| Dr. Quijano: | Yes. |
| The State: | There's that age old proposition that says the State cannot interview a defendant because that wouldn't be fair to him and make him given [*sic*] up his rights, right? |
| Dr. Quijano: | Yes. |
| The State: | And then, the other side of that coin is the defendant can have the individual evaluated and looked at for that opinion, right? |
| Dr. Quijano: | Yes. |
| The State: | But did you interview the defendant or talk to him at all? |
| Dr. Quijano: | No. |
| The State: | Would you have found any value in what he said to you? |
| Defense Counsel: | Your Honor, I'm going to object. We're getting very close to the defendant's right not to testify. |
| The Court: | Overruled. |
| The State: | Do you think there would have been any value, clinically, in talking to the defendant? |
| Dr. Quijano: | Sure. The more information I can get, the better. |

The state habeas court examined this claim and concluded that appellate counsel was not ineffective because the Fifth Amendment issue was procedurally barred from review by the Texas contemporaneous objection rule; and even if the issue was not barred, the statements were not comments on Rosales's post-arrest silence but were merely inquiries into the basis of the defense expert's opinion on cross-examination pursuant to Tex.R.Evid. 705(a) and/or a rebuttal to the psychological testimony offered by Rosales pursuant to *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987). The state court decision addressed the merits of the claim, the record clearly supports the state court's findings of fact, and Rosales has offered no evidence to rebut the findings. Hence the state court findings are presumed to be correct under § 2254(e)(1).

To evaluate this claim of ineffective appellate counsel, the Court must "counterfactually determine the probable outcome on appeal had counsel raised the argument." *United States v. Williamson,* 183 F.3d 458, 463 (5th Cir.1999).

■ The state habeas court first concluded that appellate counsel's failure to raise this issue on appeal was not deficient performance because the issue was barred from direct review by the Texas contemporaneous objection rule. *See Muniz v. Johnson,* 132 F.3d 214, 221 (5th Cir.1998) (finding that the Texas contemporaneous objection rule is an adequate state procedural rule that is strictly and regularly enforced). The Texas contemporaneous objection rule requires that a party who wants to preserve error for appellate review "make a timely, specific objection and obtain a ruling on the objection." *Broxton v. State,* 909 S.W.2d 912, 918 (Tex.Crim. App.1995) (citing Tex.R.App.P. 52(a)). "Failure to timely object generally waives error unless the statement is so prejudicial that no instruction can cure the harm." *Hollins v. State,* 805 S.W.2d 475, 476 (Tex. Crim.App.1991). "[I]t is well settled that an error in admission of evidence is cured where the same evidence comes in elsewhere without objection; defense counsel must object every time allegedly inadmissible evidence is offered." *Ethington v. State,* 819 S.W.2d 854, 858 (Tex.Crim.App. 1991) (quoting *Hudson v. State,* 675 S.W.2d 507, 511 (Tex.Crim.App.1984)). "[E]ven constitutional errors may be waived by failure to object at trial." *Broxton v. State, supra.*

The state court determination that the alleged Fifth Amendment error was barred from appellate review may not be questioned by this Court. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). This essentially forecloses Rosales's claim under *Strickland* that his appellate counsel performed deficiently in failing to raise the Fifth Amendment issue on appeal because it was procedurally barred from appellate review. *Cf. Robison v. Johnson,* 151 F.3d 256, 261

(5th Cir.1998) (holding that counsel was not deficient for failing to proffer evidence where the state court had determined that the evidence was inadmissible and the federal court could not question the state court determination). The Court therefore finds that the state court decision on this ineffectiveness claim was not an unreasonable application of federal law as determined by the Supreme Court. *Cf. Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (reversing the Fifth Circuit Court of Appeals decision to review the merits of a habeas complaint that the state violated *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), when the state courts had determined the claim was procedurally barred from review by the state contemporaneous objection rule).

The state court alternately concluded that counsel's failure to raise this claim on appeal was not objectively unreasonable because the comments by the prosecutor did not violate the Fifth Amendment. The Fifth Amendment claim shall be addressed in part III.G., *infra,* and for the reasons stated therein, the Court finds that the state court's alternate holding was not contrary to or an unreasonable application of federal law. *Cf. Pitts v. Anderson,* 122 F.3d 275, 283 (5th Cir.1997) (holding that if no Fifth Amendment error occurred at trial, counsel cannot be found ineffective for failing to raise it on appeal).

**G. Rosales's Fifth Amendment right was violated when the State was allowed to question his silence at a time after his arrest.**

Rosales argues that the state's questions and comments as set forth in Ground for Review III.F., *supra,* were comments on his failure to testify in violation of the Fifth Amendment.

The state habeas court found that this complaint was procedurally barred from habeas review because trial counsel failed to timely object, and alternatively, that relief should be denied even if there was a violation of the Fifth Amendment because Rosales failed to demonstrate that he was harmed by the error under *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *See Corwin v. Johnson,* 150 F.3d 467, 471 (5th Cir.1998) ("It is clear in this Circuit that alternative rulings do not operate to vitiate the vitality of a procedural bar that constitutes the primary holding."). Specifically, the state court determined that:

(1) "Defense counsel failed to preserve any alleged error by failing to make a timely objection.... [T]he question had been asked and answered at least twice before there was an objection."

(2) This issue should have been raised on direct appeal and a habeas proceeding was not the appropriate vehicle for such a claim.

(3) There was no Fifth Amendment violation because the "State was rebutting psychological testimony that [Rosales] had presented on his behalf."

(4) Even if the State had unconstitutionally commented on his right to remain silent, Rosales did not establish "that the error had a substantial and injurious effect or influence in determining the jury's verdict."

"Texas applies its contemporaneous objection rule 'strictly and regularly' and ... it is an 'independent and adequate state-law procedural ground sufficient to bar federal court habeas review of federal claims.'" *Hughes v. Johnson,* 191 F.3d 607, 614 (5th Cir.1999) (quoting *Amos v. Scott,* 61 F.3d 333, 345 (5th Cir.1995)). To be considered timely, "an objection must be made as soon as the ground for objection becomes apparent, i.e., as soon as the defense knows or should know that an error has occurred." *Hollins v. State,* 805 S.W.2d 475, 476 (Tex.Crim.App.1991).

The state court determined that Rosales's trial counsel did not timely object because the question regarding his Fifth Amendment right to remain silent was asked and answered twice before counsel objected, and the record supports this finding under the state law of Texas. *See Estelle v. McGuire, supra* (holding that a federal court should not reexamine state court decisions based on state law questions). Thus, the claim is barred from federal habeas review unless Rosales can demonstrate cause and prejudice or "actual innocence."

Rosales, however, has not argued or demonstrated that the procedural default should be excused because of "cause and prejudice" or his "actual innocence." *See Wheat v. Johnson,* 238 F.3d at 360 (holding that claims were procedurally barred where a petitioner made no attempt to argue cause and prejudice). Accordingly, the Court finds that this claim is procedurally barred from federal habeas review.

Although the Supreme Court has determined that alternative holdings do not "vitiate the vitality of a procedural bar," this Court shall address the state court's alternate holding that the state's comments did not violate the Fifth Amendment because they were harmless.

 The Supreme Court has clearly stated that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (footnote omitted). The prosecution is not, however, prohibited from "commenting on the defense's failure to counter or explain the evidence as opposed to defendant's failure to testify." *United States v. Grosz,* 76 F.3d 1318, 1326 (5th Cir.1996). To

determine whether a prosecutor's remarks are constitutionally impermissible, a court must view the comments in context and consider whether "the 'manifest intent' of the remarks was to comment on the defendant's silence, or ... the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." *United States v. Pennington,* 20 F.3d 593, 599 (5th Cir.1994). A "prosecutor's intent is not manifest if there is some other, equally plausible explanation for the remark." *United States v. Grosz,* 76 F.3d at 1326. If the court determines that the remark or comments were constitutionally impermissible under the Fifth Amendment, the court must then determine whether the error was harmless under the *Kotteakos/Brecht* standard. *Id. See Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (holding that the harmless error standard set out in *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), "applies in determining whether habeas relief must be granted because of constitutional error of the trial type").

The prosecutor's comments,as set out in part III.F., *supra,* appear to have been made in an attempt to elicit information from the defense's expert witness regarding the underlying basis for his opinion testimony, that is, whether he had interviewed the defendant before testifying and whether such an interview would have assisted him in forming his opinion. Moreover, there does not appear to be have been a "manifest intent" by the prosecutor to comment directly on the defendant's failure to testify. Regardless, however, of whether the remarks violated the Fifth Amendment, the Court finds that the remarks were extremely brief, the prosecutor did not refer to the defendant's right to remain silent in his closing argument, evidence of Rosales's pre-arrest confessions was admitted, and the evidence of guilt

was overwhelming. Thus, Rosales has failed to demonstrate that the alleged remarks "had a substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson,* 507 U.S. at 639, 113 S.Ct. 1710 (holding that where the state's evidence of guilt was weighty, and the references to the defendant's post-*Miranda* silence were infrequent and cumulative with extensive and permissible use of pre-*Miranda* silence, there was no harm).

Accordingly, Rosales has failed to demonstrate that the state court decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court.

## H. Rosales's constitutional right to confront an adverse witness was violated when the trial court unduly limited cross-examination of the State's witness Dr. Mears.

Rosales argues that the trial court erred in prohibiting him from using an incomplete and unauthenticated copy of a transcript from a trial in another jurisdiction to either (1) refresh the recollection of the prosecution's expert witness on future dangerousness, or (2) impeach his testimony, and this restriction violated his Sixth Amendment right to confront an adversarial witness.

The state court determined, in alternative rulings, that (1) this ground should have been raised on direct appeal rather than in an application for a writ of habeas corpus; (2) the defense failed to preserve any error regarding this complaint because no bill of exception or offer of proof regarding the contents of the excluded document was made at trial and a motion in limine is not sufficient to preserve error; (3) the trial court did not abuse its discretion by granting a motion in limine to exclude an uncertified copy of a portion of

a transcript from prior testimony by Dr. Mears in a trial in Midland, Texas; and (4) even if the trial court ruled incorrectly, Rosales failed to demonstrate that he was harmed by the error. The trial court specifically found that the motion in limine "merely instructed the defense that it would not be allowed to go into the transcript on cross-examination until it had provided a full copy to the State"; "the defense was not limited in its questioning regarding the expert's memory of the testimony in Midland"; and "the defense did attempt to impeach the witness about the resume that he submitted at the Midland trial." Thus, the state court concluded alternatively that the issue was procedurally barred from habeas review or that even if the right to confrontation was limited, the limitation was harmless error. To the extent that the alternate decision was an adjudication on the merits, the findings of fact are entitled to the presumption of correctness under § 2254(e)(1) because they are supported by the state court record and Rosales has failed to offer any evidence to rebut the findings.

Prior to trial, the prosecution filed a motion in limine to prevent defense counsel from introducing portions of a transcript from testimony given by Dr. Gary Mears in a trial in Midland, Texas. Nevertheless, a motion in limine does not preserve error for appellate review in the State of Texas. *Webb v. State*, 760 S.W.2d 263, 275 (Tex.Crim.App.1988). Furthermore, a ruling on a motion in limine that excludes evidence "is subject to reconsideration throughout trial" and "to preserve error an offer of the evidence must be made at trial." *Warner v. State*, 969 S.W.2d 1, 2 (Tex.Crim.App.1998).

"Texas Rule of Criminal Evidence 103(a)(2) provides that error may not be predicated upon a ruling which excludes evidence unless a substantial right of a party is affected and the substance of the

evidence was made known to the court by offer of proof or was apparent from the context within which questions were asked." *Id.* An offer of proof may be made in question and answer form or in a concise statement, but if it is made in a concise statement, such statement "must include a reasonably specific summary of the evidence offered and must state the relevance of the evidence . . . ." *Id.*

Rosales's counsel did not make an offer of proof of the copy of the excluded transcript and although the record shows that counsel did briefly state what the contents were and what the defense expected to use the transcript for, the state court found that this was insufficient to perfect a complaint about the excluded transcript for appeal. *See Garcia v. State*, 887 S.W.2d 862, 874 (Tex.Crim.App. 1994) (holding that no offer of proof was made where an excluded letter was not made a part of the record and the content of the letter was not sufficiently summarized). Hence, the state court found that this complaint was procedurally barred from review under state law. The state court determination that this issue was not preserved for appeal and therefore procedurally barred from habeas review was neither contrary to nor an unreasonable application of clearly established federal law. And Rosales has not shown "cause" for the default and "prejudice attributed thereto," or demonstrated that the failure to review the defaulted claim will result in a "fundamental miscarriage of justice."

Although an alternative decision on the merits does not invalidate an initial determination that a claim is procedurally barred, the Court shall address the merits of the state's alternate finding that Rosales suffered no harm from this alleged constitutional violation.

■ "Generally speaking, the Confrontation Clause guarantees an **opportunity** for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (emphasis in original). "It is axiomatic that defense counsel should be permitted to expose to the jury facts relative to a witness' possible motivation to testify favorably for the prosecution or his potential bias for or against any party to the criminal proceeding." *Wilkerson v. Cain,* 233 F.3d 886, 890 (5th Cir.2000). Nevertheless, "[t]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). A complaint that the trial court unduly restricted cross-examination of a state's witness is a mixed question of fact and law, and on federal habeas review is subject to harmless error analysis under *Brecht v. Abrahamson. Wilkerson v. Cain,* 233 F.3d at 890–92. *See Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (holding that the constitutionally improper denial of a defendant's opportunity to impeach a witness is subject to harmless error analysis). Thus, to be entitled to relief on a claim regarding violation of his Sixth Amendment right to confrontation, Rosales must show not only that the right was in fact violated, but also that "there is 'more than a mere reasonable possibility that the [error] contributed to the verdict.'" *Wilkerson v. Cain,* 233 F.3d at 892 (quoting *Woods v. Johnson,* 75 F.3d 1017, 1026 (5th Cir.1996) (emphasis omitted)).

■ Although the record confirms Rosales's claim that the transcript was excluded, the record supports the state court findings that defense counsel did attempt to impeach Dr. Mears with information from the excluded transcript and his questioning of the witness regarding the transcript was not limited. Rosales, therefore, cannot demonstrate that "there is more than a reasonable possibility that the [exclusion of the transcript] contributed to the verdict." *Id. Cf. United States v. Mizell,* 88 F.3d 288, 294 (5th Cir.1996) (holding that the exclusion of impeachment evidence which was cumulative to impeachment evidence already admitted at trial was harmless error).

**I. Appellate counsel was constitutionally ineffective when he failed to argue that Rosales's constitutional right to confrontation was violated by the trial court's improper limitation on the cross-examination of Dr. Mears.**

■ This claim is foreclosed by the decision in ground for review III.H., *supra,* which determined, in part, that review of the confrontation claim was procedurally barred because of trial counsel's failure to comply with the Texas contemporaneous objection rule. Because the claim was procedurally barred, it would have been futile for appellate counsel to raise the issue. *See Koch v. Puckett,* 907 F.2d 524, 527 (5th Cir.1990) (holding that counsel's performance cannot be deficient when he fails to raise a frivolous point).

■ The Court also determined in part H. that there was no violation at trial of Rosales's right to confront the State's expert witness Dr. Mears, and that even if there was a violation, it was harmless error under *Brecht v. Abrahamson, supra.* Rosales, therefore, cannot demonstrate that he was prejudiced under *Strickland*

by appellate counsel's failure to raise a meritless error or an error that was harmless. *Cf. Lombard v. Lynaugh,* 868 F.2d 1475, 1482 n. 9 (5th Cir.1989) (holding that a petitioner who is not prejudiced by a failure to object to an error at trial is not prejudiced by the failure to raise the issue on appeal).

Accordingly, this Court finds that the state court's denial of this claim was not "contrary to" or "an unreasonable application of" clearly established Federal law as determined by the Supreme Court.

**J. Trial counsel was constitutionally ineffective when he failed to preserve for appeal the issue of whether the trial court's limitation on the cross-examination of Dr. Mears violated Rosales's constitutional right to confront an adverse witness.**

This claim is likewise foreclosed by the decision in Ground III.H., *supra,* that the right to confrontation was not unduly limited. Even if this ruling is incorrect, however, Rosales has not demonstrated that he was prejudiced by his counsel's failure to object to the trial court's limitation.

The state court determined that counsel's performance was not deficient because (1) the right to confrontation was not improperly limited; thus, there was no reason to object, and (2) Rosales was not prejudiced because trial counsel did, in fact, attempt to cross-examine Dr. Mears with the excluded transcript. The state court found alternatively that, even if there was an unconstitutional limitation on the right to confront the witness, there was no harm shown because Rosales did not demonstrate how Dr. Mears could have been impeached with the transcript. The state court decided the merits of this claim, the findings of fact are supported by the record, and Rosales tendered no evidence to rebut the findings. Hence, the state court findings are presumed to be correct under § 2254(e)(1).

As previously noted in Ground H, there was no constitutional violation of Rosales's right to confront Dr. Mears because the trial court did not unduly restrict cross-examination of the expert witness, and even if there was an undue restriction, Rosales failed to demonstrate that he was harmed by the restriction. Counsel's failure to perfect the appeal may have been deficient performance in the strictest sense, but because he ultimately cross-examined Dr. Mears with the discrepancies between his testimony in the previous trial and his testimony on direct in this case, Rosales cannot demonstrate that but for counsel's failure to perfect the appeal, there is a reasonable probability that the outcome of his trial, or his appeal for that matter, would have been different. *Strickland v. Washington, supra. See Lamb v. Johnson,* 179 F.3d 352, 359 (5th Cir.1999) ("The mere possibility of a different outcome is not sufficient to prevail on the prejudice prong.").

Accordingly, this Court finds that the state court's denial of relief on this claim was neither contrary to nor involved an unreasonable application of clearly established Federal law.

**K. Rosales's rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment were violated by the trial court's failure to define "life sentence" and/or the failure to instruct the jury that, if sentenced to life in the Texas penitentiary, Rosales must serve 40 years before he would be eligible for parole.**

Rosales argues that the trial court erred in failing to instruct the jury at punishment that if they were to impose a life sentence, he would not be eligible for pa-

role until he had served forty calendar years. He alleges that this failure to instruct the jury violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment and was contrary to the Supreme Court's decision in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

The state habeas court determined that this ground should have been raised on direct appeal rather than in a habeas application; there was no contemporaneous objection to the failure to give the suggested instruction; there was no violation of the Due Process and Equal Protection Clauses; and Rosales did not demonstrate that he was harmed by the court's failure to give the suggested instruction.

■■■ As previously noted, the Texas contemporaneous objection rule has been found to be an "independent and adequate" state procedural rule. The record clearly supports the state court finding that Rosales did not object to the trial court's instructions at the punishment phase or request a specific instruction on parole and a life sentence. Rosales demonstrated neither "cause and prejudice" nor a "fundamental miscarriage of justice;" therefore, his complaint about parole instructions and definitions of "life" at the punishment phase is procedurally barred from federal habeas review. Moreover, both the Supreme Court and the United States Court of Appeals for the Fifth Circuit have rejected the argument that the Fourteenth Amendment Due Process Clause is violated when a trial court fails to instruct a jury in Texas that a defendant sentenced to life may be eligible for parole after thirty-five or forty years. *Tigner v. Cockrell,* 264 F.3d 521, 524–25 (5th Cir.2001). The Fifth Circuit has also specifically rejected this claim under the Equal Protection Clause. *Id.* at 525–27.

■■■ As for Rosales's allegation that *Simmons* supports this claim for relief, the Court finds that his argument is baseless. First, the Court notes that the *Simmons* complaint is barred from federal habeas review by the *Teague* nonretroactivity doctrine. *Id.* at 524–25. *See Clark v. Johnson,* 227 F.3d at 282 (holding that a federal habeas claim regarding a failure to instruct the jury that a defendant convicted of capital murder would be eligible for parole in 35 years did not fall within any exceptions to the *Teague* rule and was therefore "barred under the non-retroactivity limitation in *Teague v. Lane[, supra]*."). Second, his reliance on *Simmons* is misplaced because contrary to his argument, the plurality decision in *Simmons,* a case involving a *parole ineligible* defendant, does not stand for the broad proposition that, if a criminal defendant "will be ineligible for parole for a substantial period of time," a formal instruction concerning a defendant's parole eligibility may be required under the Due Process Clause. "*Simmons* applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison." *Ramdass v. Angelone,* 530 U.S. 156, 169, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000). *See Simmons v. South Carolina,* 512 U.S. at 156, 114 S.Ct. 2187 (plurality opinion) (limiting the holding to situations in which "state law prohibits the defendant's release on parole"); *id.* at 178, 120 S.Ct. 2113 (O'Connor, J., concurring) ("Where the State puts the defendant's future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process entitles the defendant to inform the capital sentencing jury ... that he is parole ineligible."). Rosales was not parole ineligible.

Accordingly, this Court finds that the state habeas court's adjudication on the merits was neither "contrary to" nor "an unreasonable application of" clearly established federal law, as determined by the

Supreme Court. *See Ramdass v. Angelone,* 530 U.S. at 178, 120 S.Ct. 2113 (plurality opinion) (holding that state supreme court's denial of habeas relief on a *Simmons* claim because the applicant did not show that he was ineligible for parole when the jury was considering his sentence was neither contrary to, nor an unreasonable application, of Supreme Court law).

## IV. CONCLUSION

"A summary judgment is only appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Myers v. Collins,* 8 F.3d 249, 252 (5th Cir.1993). *See* Fed.R.Civ.P. 56(c) (stating that judgment shall be rendered if pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law). Rosales has failed to demonstrate that there are any genuine issues as to the material facts surrounding his federal habeas claims.

For the reasons stated above, therefore, the Court GRANTS Respondent's Motion for Summary Judgment, and the above-styled and -numbered cause is DISMISSED with prejudice.

All relief not expressly granted is denied and any pending motions are hereby denied.

SO ORDERED.